IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 22-cr-2053 MLG |
| | ) | |
| **JOHN LOPEZ,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

The United States respectfully files this sentencing memorandum requesting the Court impose a guideline sentence, and restitution in the amount of $18,363,213.40 plus prejudgment interest tied to the increase in value of the precious metals purchased. As ground the United States submits:

## BACKGROUND

### I.     The Offense Conduct

The Defendant is before the Court for defrauding over a hundred people. His victims included his own brother, close friends, children of close friends, and many, many others. For many of his victims, Lopez took their life's savings.

His scheme to defraud was sophisticated. It started with a lie. He told prospective clients that he had a method to beat the stock market by buying and selling stocks and bonds and a history of so doing. He could "guarantee" a certain annual or monthly return.

And people believed him. Many did so because Lopez's pitch did not come to them cold. They had heard from their own friends and family that Lopez was honest, that Lopez's method

worked, and that Lopez paid out what he had promised. Indeed part of what made his scheme so successful was something called his "Guaranteed Monthly Benefit Program." To those within it, Lopez promised to pay a monthly sum far exceeding a traditional annuity. Invest just $500,000 with him upfront and Lopez would pay $8,000 monthly with your principal investment untapped. Trial Exhibit 4 at 7-8.[1] And he did pay monthly – though not from investment gains as Lopez represented. But prospective clients did not know that. Instead all they saw was Lopez paying their friends and family as promised; that was proof enough that Lopez's representations were legitimate.

But Lopez's lies did not stop with his investment pitch nor even with the misleading monthly payouts. He also lied about the returns he made. Month after month, quarter after quarter, he lied about how much money he had made for each client and about how much money they could withdraw at any given moment. Many came to believe Lopez had made them millionaires.

Because of those lies, people changed their lives. They retired early or made plans to do so. They took on debt that they otherwise would not have. At least one picked a less lucrative profession, trusting the returns Lopez had represented to her would make up the difference.

As the Court knows, however, and as the evidence at trial showed, Lopez did not have a method to beat the market nor did he have a history of beating it either. Instead, he primarily, bought and held precious metals. The value of those metals did not come even close to covering

---

[1]Attached here as 187-1.

the returns he had represented – the shortfall equaling tens of millions of dollars:



The upshot being that had even a small selection of Lopez's clients withdrawn funds, everyone else would have lost everything:

| | Name | Statement Balance | | Date of Statement |
|---|---|---|---|---|
| 1 | Frankfort, James and/or Patricia | $ | 3,941,573.23 | 5/31/2022 |
| 2 | Ortiz, Amy and/or Anthony | $ | 3,893,178.02 | 3/31/2022 |
| 3 | Lopez, Frank and/or Linda | $ | 3,780,493.33 | 3/31/2022 |
| 4 | Martinez, Felix and/or Lilian | $ | 2,506,133.81 | 5/31/2022 |
| 5 | Yaeger, Alan | $ | 1,947,084.84 | 3/31/2022 |
| | Sum of top 5 account balances | $ | 16,068,463.23 | |
| 6 | Lopez, Frank and/or Linda | $ | 1,570,185.14 | 5/31/2022 |
| 7 | Robinson, Paul and/or Hayden | $ | 1,572,512.40 | 5/31/2022 |
| 8 | Gonzalez, James | $ | 1,291,544.61 | 5/31/2022 |
| 9 | Yolanda, Jose and/or Cecilia | $ | 1,266,780.47 | 5/31/2022 |
| 10 | Patton, John and/or Kristy | $ | 1,155,428.60 | 5/31/2022 |
| 11 | Cole, Keith | $ | 951,424.40 | 5/31/2022 |
| 12 | Martinez, Felix and/or Lilian | $ | 896,240.91 | 5/31/2022 |
| 13 | Gonzalez, Steven | $ | 825,579.02 | 5/31/2022 |
| 14 | Smith, Robert | $ | 826,701.77 | 5/31/2022 |
| 15 | Martinez, Felix and/or Lilian | $ | 825,081.47 | 5/31/2022 |
| 16 | Bryant, David | $ | 777,132.50 | 5/31/2022 |
| 17 | Patton, Jeff and/or Wendy | $ | 743,153.74 | 5/31/2022 |
| 18 | Field, Rachel | $ | 611,181.77 | 5/31/2022 |
| 19 | Carvalho, Roger | $ | 570,550.35 | 5/31/2022 |
| 20 | Ortiz, Amy and/or Anthony | $ | 573,246.62 | 5/31/2022 |
| 21 | Suazo, Julian | $ | 552,269.77 | 5/31/2022 |
| 22 | Valdez, Armando | $ | 547,240.93 | 5/31/2022 |
| 23 | Lopez, Felix | $ | 536,679.45 | 5/31/2022 |
| 24 | Archuleta, Rudy | $ | 500,000.00 | 5/31/2022 |

Lopez profited off of his scheme.  He lived comfortably for eight years on an approximate six-figure salary, for which he did very little work, and on which he appears to have paid minimal

taxes, *see* Doc. 180 at 6-7 (admitting he has not "filed tax returns for the past five years").  In addition, as of 2021 Lopez controlled approximately $14 million of client funds and had converted them into precious metals – largely untraceable assets.  He held these assets in his own home, office, and a storage unit he controlled.  The assets were not labeled or segregated by investor.  In short, there was absolutely nothing keeping him from using those precious metals at any time for his own purposes.

Once Lopez was alerted to the FBI's investigation into him, he did not stop his criminal conduct – he accelerated it.  He courted new investors to pay off old clients.  In November 2021, for example, he took a $150,000 check from a new client and used all but $2,167.33 to pay off previous investors.



To most, if not all of these new investors, he did not tell them he was under investigation by the FBI.

Lopez also continued to purchase precious metals with client funds.  At first he did so as he always had, by receiving checks from clients and paying out to precious metal companies with his own checks.  Around the same time he started receiving discovery in this case, however, Lopez

stopped his usual method of purchasing precious metals and instead started signing third-party checks directly to a precious metal dealer, Route 66 Coin and Collectibles.  In so doing, Lopez thwarted the generation of banking documents tied to him and to his company relating to his purchases of precious metals. All told, in the time since November 8, 2021, Lopez purchased approximately $3.5 million of precious metals.

## II.    Post-Indictment Conduct.

On December 20, 2022, a federal grand jury returned an indictment against Lopez, charging him with 16 counts of wire fraud and 11 counts of mail fraud.  Doc. 2.  Since Lopez has been indicted, he has violated his conditions of release at least three times, if not more.

### A.    First violation – committing a new federal crime

After his initial indictment, the honorable John F. Robbenhaar, United States Magistrate Judge, released Lopez pending trial on several conditions including one that he not violate any federal law.  Within weeks of that order, Lopez violated that condition by committing a new fraud. As alleged in the Superseding indictment, Doc. 32, Lopez solicited a new investor and took her money.  He signed her check over to Route 66 for precious metals.

On that ground, in October 2023, the United States sought revocation of Lopez's release. Doc. 34.  Judge Robbenhaar granted the motion to revoke, but denied the United States' request that Lopez be detained pending trial.   Instead, he imposed additional conditions of release including: (1) that Lopez "provide the pretrial services office with a monthly income and expenditure sheet which will itemize all expenses in excess of $1,000"; and (2) that Lopez "not sell, dispose of, encumber, or transfer his interest in any assets in excess of $1,000 without the Court's permission." Doc. 40 at 3.  The conditions expressly provided that they included "all personal *and* business finances, as well as any transactions on behalf of others."  *Id.*

B.    <u>Second violation – selling assets</u>

Within weeks of *that* order of release,  Lopez again violated his conditions. This time he did so by selling precious metals, in an amount exceeding $1,000 without seeking prior Court permission.  *See* Doc. 61.  As argued in the motion, the United States believed selling proceeds likely interfered with this Court's ultimate obligation to order payment of restitution.  *Id.* at 5.

In January 2024, the United States again sought revocation of Lopez's release.  Doc. 61.  Again, Judge Robbenhaar granted the motion to revoke, but denied the United States' request that Lopez be detained pending trial.  Doc. 84.  Instead he fashioned more conditions of release including house arrest and a stricter financial transaction prohibition.  *Id.*

C.    <u>Third violation – investor contact</u>.

After the jury convicted Lopez, the Court reimposed all of the same conditions of release as Judge Robbenhaar did.  Doc. 179-1 at 31.  One of those conditions was that the "Defendant shall have ZERO contact with investors."  Doc. 88 at 3 (emphasis Judge Robbenhaar's).  On January 13, 2025, Lopez violated that condition of release.

 This violation occurred while Lopez was traveling to New Mexico for a neuropsychological exam, which had been organized by his attorneys.  *See* Doc. 127 (motion for modification of his release).  After securing modification of his conditions of release so that he could travel between January 12, 2025, and January 15, 2025, to attend an evaluation for his defense, Doc. 128, Lopez used that opportunity to violate this Court's orders and lunch with at least one of his investors, Sam Archuleta, a man who testified at trial.  To commemorate this lunch, they had a photograph taken together:



Dated January 13, 2025.  John Lopez center with Sam Archuleta on the right.

Attached hereto as Doc. 187-2.  What they spoke about at lunch is unknown, but the contact alone is in violation of his conditions.  Doc. 88 at 3.

D.    <u>Fourth violation – failure to provide financial documentation to the probation and to the Court</u>

As the Court is aware,  Lopez has refused to provide certain requested financial documents to Probation and, ultimately, to the Court, so that it could consider all of the relevant factors at sentencing. *See* Doc. 172.  The probation office gave Lopez several opportunities to provide those documents and he failed to do so.  When Lopez addressed this failure to comply in a filing, his response as to a remedy was revealing:

The appropriate remedy [for this failure to provide documents] is for Probation (and the government) to draw whatever inference it may from the missing documents and for the parties to make their arguments during sentencing.

Doc. 180 at 6.

In other words, the "remedy" for this violation is not adhering to the Court's orders but is argument in front of the Court. In short, he told the Court that he is above this Court's orders.

    E.    <u>Fifth violation – investor contact, financial transactions</u>

Finally, less than a week after his trial convictions, *see* Doc. 123 (convictions dated September 26, 2024), Lopez violated his conditions of release by meeting with an investor, M.Y., and accepted additional investor funds from her. Witness Declaration attached hereto as 187-3 and accompanying receipts 187-4; *See* Doc. 88 at 3 (noting there will be "ZERO" contact with investors and "ZERO" financial transactions other than to pay personal taxes and expenses).

More specifically, on October 2, 2024, Lopez accepted $140 in cash from M.Y. to put into a retirement account for her and her children. *Id.* at 1-2. The money was to be invested in silver. *Id.* at 2. M.Y. delivered this money to Lopez in person, to which he gave her a receipt. *Id.* at 2; Doc. 187-4. These were not the only financial transactions between her and Lopez, as the receipts provided show additional transactions, all postdating Lopez's indictment. Doc. 187-4. This income and asset is not reported in the PSR, Doc. 144, at 20-21, most likely because Lopez did not report it.

Accordingly, less than a week after the Court extended grace to Lopez in allowing him release pending sentencing, Lopez defied the Court, took more money from an investor, and withheld that information.

    F.    <u>The approximate $3.5 million in precious metals.</u>

As the Court is aware, since the execution of the search warrants, Lopez has accumulated approximately $3.5 million in precious metals. *See* Doc. 168 at 5, 33 (for an accounting of the

$3.5 million in precious metal purchases post-search warrant).  Pursuant to subpoena, Lopez's company, PMMCO, was to turn over those assets in 2024 as evidence of a crime.  Lopez through his attorneys agreed to do so.

In approximately May 2024, in reliance on representations from Lopez's counsel, and in anticipation of hauling a heavy load of precious metals, approximately 7 law enforcement agents traveled from Albuquerque, New Mexico to Flagstaff, Arizona in a rented u-haul-type vehicle to secure the precious metals.  As it relates to those precious metals, Lopez handed the agents a key and a note, which referenced Route 66 coin and collectibles. Law enforcement traveled to Route 66 to collect the precious metals.  When they arrived, the stores' proprietor denied that Route 66 was storing any precious metals for Lopez or for PMMCO.  The proprietor gave two of the agents a tour of the premises, and they found no evidence there of the precious metals for which they were looking.

The current whereabouts of the approximate $3.5 million in precious metals remains unknown to the United States.

## III.    Victim impact

Lopez's conduct has harmed over a hundred people.[2]  The United States Probation Office meticulously detailed through dozens of victim impact statements how Lopez hurt them.  As previously recounted in its response to Lopez's objection to the PSR, Doc. 183, the financial hardship so many endured is substantial:

---

[2]As part of his objections to the PSR, Lopez claimed that the government was actually at fault for the hardship caused to victims.  For all of the reasons articulated in the United States' response, Doc. 184 at 5-11, Lopez's argument is wrong.  The simplest reason for why he is wrong is that the United States' actions to *preserve* assets for victims is not a cause of the harm Lopez inflicted.  Lopez's argument here is yet another attempt to escape accountability; the Court should not be taken in by it.

> B.E. – a Lopez victim – delayed his retirement by 2 years.  Doc. 147 at 2.  Another victim, M.C., is insolvent and gone into incredible debt.  Doc. 147 at 31-32.  B.H. cannot live on her retirement as planned and has been surviving on social security alone.  Doc. 150 at 5.  Her husband died not knowing the outcome of this case and was not able to live off his retirement as he expected.  *See id.* at 2.  Still another victim, D.M., saved for 25 years and retired in 2021.  Doc. 156 at 4.  Because of Lopez, he has to live paycheck to paycheck and has, on occasion, been unable to pay utilities and provide food for him and his wife.  *Id.*  Another victim, W.M., has fallen behind on his mortgage and is still struggling.  Doc. 157.

Doc. 183 at 6.

And there are other harms his victims endured that, while not meeting the Guidelines definition of "substantial financial hardship," are still very real and may well stay with victims for the rest of their lives.  For example, some described that "family dynamic[s]" have been "torn" apart.  Doc. 151 at 13; *see also* Doc. 152 at 16; Doc. 153 at 12.  Lopez's fraud was built on trust not just between him and his clients, but between family members.  So many invested with Lopez because their family or sometimes their close friends encouraged them to do so.  *See* Doc. 161 at 4.  Lopez preyed on that trust – that we all enjoy between family members – and shattered it.  Things may never be the same for these families.

Other harm endured is more tangible.  C.B., one of Lopez's victims, described not being able to provide comfort for his mother in 2024 as she fought and, ultimately, succumbed to cancer.  Doc. 153 at 4.  Another victim, Anthony O., who testified at trial described that as a result of this fraud he was unable to purchase his family home when his parents passed – a home he helped his father build.  Doc. 161 at 4.  The home is with a stranger now.  *Id.*

Lopez's actions have also hurt small businesses, Doc. 153 at 6-8, resulted in insolvency for some, and caused emotional distress including cases of depression *Id.* at 6, 12-13, Doc. 155 at 7, and shame, Doc. 154 at 2, Doc. 157 at 12.  One victim described "[s]leepless nights" with uncertainty about whether "we will ever get an[y] of our money back."  Doc. 151 at 3.  That fear, uncertainty and anxiety is a common experience for most if not all of Lopez's victims.

10

## ARGUMENT

A guideline sentence is sufficient but not greater than necessary for all of the reasons articulated below.  *See* 18 U.S.C. § 3553(a).

## I.    THE NATURE AND CIRCUMSTANCES OF THE DEFENDANT'S OFFENSES

Trial evidence revealed that, for years, the defendant engineered a scheme that allowed him to secretly accumulate millions of dollars in his basement, an office, a storage rental unit on the side of the highway, and even somewhere "in the ground."  Trial Exhibit 277.[3]  He used the scheme to enrich himself both in terms of drawing an annual six-figure salary, but also in terms of accumulating a large hoard of untraceable wealth upon which he could draw upon at his convenience.

In his sentencing memorandum, Lopez contends that he was holding the proceeds of his fraud scheme "in trust" for his victims, Doc. 181 at 7, and that he "lacked a selfish motive," *id.* at 10.  But those contentions are belied by the evidence.  The Court need look no further than the $3.5 million of victim money held in precious metals that he has yet to turn over as proof that Lopez was not holding assets in "trust" for his clients.  If he held any intent to hold that money in "trust," he would have turned this money over.  On top of that, he did not sort the precious metals he horded by investor, he did not have a separate, accurate accounting of precious metals by investor, and he actively tried to dissuade big investors from withdrawing funds.  *See* Doc. 183 at 3-4.  That is not the conduct of man who is holding funds in trust for others; it is the conduct of the man who would avail himself of the proceeds at his leisure.

As for selfish motive, for years Lopez lived comfortably in a three-story home, siphoning at least a $160,000 a year for himself from the proceeds, and got to label himself as big shot

---

[3]Attached hereto as Doc. 187-5.

investor with roughly the same amount of assets under his control as a brand name credit union. *See* Trial Exhibit 4, Doc. 187-1 at 3.  In addition, during the course of the scheme he had under his control untraceable assets worth millions of dollars from which he could liquidate at any moment for any expense.[4]  His conduct was selfish.

---

[4] The defendant also tries to gloss over his crimes by suggesting that he acquired precious metals because he believed an economic collapse was imminent and that "[h]is crime was, chiefly, providing misinformation" to his investors. Doc. 181 at 1. But if the defendant truly had no nefarious purpose in acquiring control over his victims' life savings, then he could have simply been honest and told his victims the truth about what he was doing with their money, including the tax consequences of withdrawing their funds, how he was commingling their money, and where he was keeping it.  If all the victims wanted to do was cash out their IRA accounts and buy precious metals, for example, they did not need Lopez, especially to bury their life savings in the ground or store it in a storage unit on the side of the highway.

Indeed, if the Court accepts as true Lopez's contention that he acquired the precious metals because he believed an economic collapse was imminent, his lies about how he was investing his victims' money in stocks and bonds becomes all the more nefarious.  Consider a reality where the stock and bond market does collapse and you believe all your money is in stocks and bonds – you would think you had lost everything.  All the while Lopez could pocket the precious metals as his own.

The defendant further contends that his "case does not exhibit the hallmarks of a traditional 'Ponzi' scheme." Doc. 181 at 10.  That would be true only if you failed to pay attention at trial, *see, e.g., supra* at 3, Trial Exhibit 176.  Lopez nonetheless contends that his "significant payouts to investors, upon request, indicates that he had no intention of depriving investors of *all* of their money." Doc. 181 at 7.  But, as shown elsewhere, these monthly payments were part of the scheme and why, in part, it was so successful.  Doc. 183 at 3.  As the Court heard at trial "so many investors got involved with Lopez because they heard from trusted friends and family that Lopez paid out monthly as he promised." *Id.*  Thus, these payments "induced others to think Lopez was legitimate and aided him in persuading more people to invest with Lopez and, as a result, to keep the Ponzi scheme afloat." *Id.*  In addition, these were payments that the defendant *had* to make in order to keep the scheme afloat. As revealed during trial, by embarking on a Ponzi scheme, Lopez put himself under constant pressure to recruit new investors to keep the scheme from being discovered, and the higher he inflated the false returns on his victims' statements, the greater the risk the defendant ran that the scheme might collapse from just a handful of investors demanding to cash out.

To Lopez's claims that his "modest lifestyle"[5] demonstrates a "lack of criminal intent to deprive investors" of their money, Doc. 181 at 11, the jury's conclusion to the contrary – thirty-one times on thirty-one counts -- speaks louder.  They repeatedly found the requisite criminal intent.  *See United States v. Hunt*, 521 F.3d 636, 649 (6th Cir. 2008) (reversing and vacating a sentence because the judge discounted the jury's conclusion that the Defendant intended to commit fraud).  In addition, as the government has repeatedly highlighted, Lopez has had every opportunity to return the money to the multiple victims that he lured into his scheme *after* execution of the search warrants, but he has chosen not to do so.  It is worth emphasizing that after the execution of the search warrants, Lopez took *large* checks from new investors, including a $197,733.25 one from Freddie S., a man suffering from life-threatening medical issues related to his work at the labs, and a $531,250 check from Bernie G.  If Lopez's intent was merely to "steward" these people's money, there was and is nothing preventing him from giving that money back to them – but Lopez has not.  That speaks volumes.

Lopez's conduct has also deeply harmed over a hundred people.  As revealed by their trial testimony and victim witness impact statements he has ruined some people financially and deprived others of crucial information leading to decisions that they would not have otherwise made.  Family relationships have been tested and some broken.  Emotionally, Lopez has wreaked havoc on so many, causing sleepless nights and unearned worry.  Lopez's victims did nothing wrong.  They chose to trust someone as so many of us do based off of that person's words and recommendations from friends and family.  That Lopez preyed on that trust for his own gain is

---

[5] The United States rejects this factual contention as it is hardly a "modest life-style" to draw an annual six-figure salary for work that amounted to lying to people in investment pitches and periodically sending out false statements.

risible.  Contrary to Lopez's assertion, Doc. 181 at 1, just because some assets may be returned to these folks that will not undo the harm inflicted upon them.  They will not have their sleepless nights back, they will not have their retirement accounts back, and they will not have their lost opportunities or broken relations back.  Lopez has caused a loss that cannot easily be undone.  The nature and circumstances of Lopez's conduct support a lengthy sentence.

## II.    THE DEFENDANT'S HISTORY AND CHARACTERISTICS

Lopez is a confidence man in every sense of that term.  To those who have not seen the trial evidence, he may come across just as his sentencing memorandum paints him: a pleasant, well-meaning, misunderstood man with health issues, who should be forgiven his overzealousness in "misinform[ing]" his clients, Doc. 181 at 1, because of his "sincerely held belief[s]" to "benefit them." *Id.* at 10, 12.

But the evidence at trial and elsewhere paint a far darker portrait of the Lopez's history and characteristics.  He is cunning.  He tailored his investment pitches to his mark.  For those who cared about safety and security of their income, he emphasized his guaranteed monthly benefit option.  *See* Trial Exhibit 4, Doc. 187-1.  To those who might have prior experience in the investment industry he emphasized that a large and well-respected hedge fund used his algorithm. *See* Doc. 183-1.  To those who cared about their faith or religious causes, he emphasized that he only invested in "moral" stocks: Trial Exhibit 102, attached as Doc. 187-6 ("I do try to stay away from what I call 'sin' or 'morally-questionable' stocks like companies that sell alcohol, tobacco, marijuana in various forms as well as gambling/casino stocks and abortion industry stocks.").  All of this conduct was designed to lull his victims into investing with him or to remain invested with him.  This is not the conduct of a well-meaning, misunderstood man.  He is also not the demure, pleasant man that comes across in his recorded investment pitches.  He is a shark.  And that, in

14

part, is why a guideline sentence is so deserved – he has the deep capacity to trick people into trusting him.

That he *continues* to take money from people even *after* he is *convicted* is even more evidence of those characteristics. *See supra* at 8 (describing M.Y.'s post-trial investment with Lopez). The Court cannot trust this man with a handshake, let alone with the probation sentence he asks for. It bears stating that Lopez has the audacity to request a 34-level variance or downward departure for his crimes. This man has accepted zero responsibility for his conduct, he continues to hide proceeds, he openly defies the Court's orders to turn over relevant financial documentation, *and* he is taking more money from victims *after* his conviction. This conduct, the conduct relayed in the presentence report, and all of the conduct the Court saw at trial, betrays Lopez's history and characteristics, and the person he is, is not worthy of a one-level downward variance, let alone the double-digit one he requests. His conduct is not aberrant as he contends, Doc. 181 at 11, it is pathological.

For reasons explained more fully elsewhere, Doc. 179 at 6-8, Lopez's medical conditions are unclear at best and disingenuous at worst. Whatever they are, they are not grounds for a variance he requests. Lopez has, for example, reported symptoms to his doctors that objective medical tests cannot account for. *Id.* at 6-7 (noting various tests have come back "normal," or "unremarkable" or that symptoms have "no clear cause"). Lopez has reported medical conditions to Probation that were not confirmed in his medical records. *Id.* at 6 (detailing that Lopez reported a history of strokes, but medical records reviewed confirmed he "does not have a history of strokes"). Though describing himself as "feeble" man, Doc. 181 at 16, what is actually reported in the PSR suggests something else. A fraudster exaggerating his symptoms and medical history.

Finally, as detailed in his sentencing memorandum, Lopez hired a forensic neuropsychologist to evaluate his cognitive condition. Though performing a battery of tests on Lopez and finding "few frankly impaired performances," she nevertheless diagnosed him with neurocognitive disorder due to multiple etiologies, which, according to the Mayo Clinic, is a condition marked by "memory loss," and "trouble with language and judgment" but "it doesn't affect daily activities." <u>Mild Cognitive Impairment</u>,https://www.mayoclinic.org/ diseasesconditions/mild-cognitiveimpairment/ symptoms-causes/syc-20354578 (last accessed May 2, 2025). Even if this condition exists, a medical diagnosis that does not affect Lopez's daily activities does not warrant any variance let alone the 34-level one he wants.

For all of those reasons, the Court can comfortably conclude that a guideline sentence is supported by Lopez's history and characteristics.

**III.   THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE FOR JUST PUNISHMENT.**

The victims in this case believed Lopez to be a highly successful and professional money manager that he represented himself to be. They trusted and relied upon him to deal with them honestly, and they believed that by using the defendant's services, they were doing the responsible and prudent thing to ensure their family's future, financial security and well-being. Crimes such as those the defendant committed engender a general public distrust of the financial system and financial professionals. A guideline sentence, accordingly, serves to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

"[T]he length of the sentence should reflect the 'harm done' and 'the gravity of the defendant's conduct.'" *United States v. Walker*, 844 F.3d 1253, 1257 (10th Cir. 2017). Lopez's fraud schemes were serious offenses that caused significant harms both to his investor victims and

more broadly to the public's trust and confidence in financial advisers and the market. *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (serious nature of offense alone weighs against a lenient sentence).  Investment advisors serve an important and public purpose, to guide those into retirement and best ensure financial stability as people grow old.  When a person like Lopez abuses such trust, "[a]ccountability for such a serious offense calls for a significant punishment." *United States v. Morgan*, 635 F. App'x 423, 455 (10th Cir. 2015) (unpublished) (Holmes, J., concurring).

In developing the guidelines, the Sentencing Commission also decried "the practice of sentencing to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as … fraud … that in the Commission's view are serious." *United States v. Negroni*, 638 F.3d 434, 446 (6th Cir. 2011) (citing U.S.S.G. § 1A1.4(d)) (internal quotations omitted). Courts should not pay mere "lip service" to the need for the sentence imposed to reflect the seriousness of the offense and promote respect for the law. *Morgan*, 635 F. App'x at 449.

A probationary sentence here would not be supported by these factors nor by the law.  For example, in *Morgan,* the Tenth Circuit reversed a district judge's imposition of a probationary sentence, based on a variance from a guidelines range of 41-51 months of imprisonment.  *Morgan*, 635 F. App'x at 441.  That case involved a much less drastic variance from the guideline range than the defendant is seeking from this Court in the instant case. Yet the Tenth Circuit still held a probationary sentence to be "grossly inappropriate" in part due to the district court's failure to "seriously consider the need for the sentence imposed to promote respect for the law and to provide just punishment for the offense." *Morgan*, 635 F. App'x at 451. For similar reasons, the Eighth Circuit in *United States v. Givens*, 443 F.3d 642, 643-46 (8th Cir. 2006) found a variance for a fraud defendant, from a 24-30 month guideline range to five years of supervised release with

twelve months house arrest, 80 hours of community service, and restitution in the amount of $1,220,875, to be "wholly unreasonable." *See also United States v. Crisp*, 454 F.3d at 1285,1291 (11th Cir. 2006) (concluding that five hours of incarceration and a five-year term of supervised release for a serious white-collar offense carrying a guideline imprisonment range of 24-30 months was "more like a soft pat" than even a slap on the wrist). By comparison here, the defendant has presented no persuasive grounds for any departure or variance, much less one that would result in anything less than a guideline sentence.

## IV.    THE NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE

General deterrence supports the imposition of a guideline sentence. *See* 18 U.S.C. § 3553(a)(2)(B). "General deterrence is one of the key purposes of sentencing." *Sample*, 901 F.3d at 1200 (quoting *Walker*, 844 F.3d at 1257). Congress has recognized that general deterrence is particularly important in the context of white-collar crime. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense."); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime."). Indeed, as the Tenth Circuit has held "[w]hite collar criminals may be particularly susceptible to general deterrence because defendants in white-collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Sample*, 901 F.3d at 1200.

In other words, white collar crime is rarely spontaneous or reactive; it is crime done after calm deliberation.    Lopez's conduct fits that mold perfectly.    A sentence of incarceration,

accordingly, is far more likely to affect someone similarly situated to Lopez than say to defendant committing a crime of passion. One is therefore "hard-pressed to see how a non-custodial sentence serves the goal of general deterrence" in a serious white-collar crime case. *United States v. Kuhlman*, 711 F.3d 1321,1328 (11th Cir. 2013). Indeed, even if "society need[s] no insulation from the [white-collar] offender," a probationary sentence is still "grossly inappropriate" if "due consideration" is not given to the "critical importance" of "the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration." *Morgan*, 635 F.App'x 423, 451 (quoting S. Rep. No. 98-225, at 91-92 (1983)).

Here, the defendant invites this Court to be cynical about general deterrence, Doc. 181 at 12-14, but such cynicism has been rejected by the Tenth Circuit. Specifically, in *Walker*, the Tenth Circuit reversed as substantively unreasonable a time-served sentence where the district court had stated that it did not put "much stock" in the idea of general deterrence. 844 F.3d at 1257. As the Tenth Circuit explained, Congress has provided that general deterrence is "one of the key purposes of sentencing," *id*., and thus "[f]ederal law required the court to put its skepticism aside," *id*. at 1258. For the same reasons here, this Court should reject the defendant's suggestion to minimize the importance of general deterrence in determining the defendant's sentence. A lengthy sentence here serves the purposes of general deterrence.

## V. THE NEED FOR THE SENTENCE TO PROTECT THE PUBLIC FROM FURTHER CRIMES

As the Court is aware from the many instances in which the government has sought to have the defendant's conditions of release revoked, nothing has deterred the defendant from continuing to engage in criminal activity. The defendant did not stop after federal agents raided his home and office when he continued to lure new victims into his scheme. He did not stop after he was indicted, when he again lured a new victim into his scheme, which resulted in a superseding indictment. He

also did not stop after he came to court following the superseding indictment, and was again released, as he instead chose to resume paying victims Ponzi payments through a third party. And now, following his convictions for 31 crimes, he has again impermissibly sought to act as financial advisor for yet another potential victim. *See supra*, at 8. Because of the defendant's base dishonesty, selfishness, intelligence, and ability to persuade others to trust him, he has demonstrated that he will always present a substantial risk of recidivism. While age is frequent heuristic in this realm, the evidence in front of the Court shows that the common rule-of-thumb has no bearing on this Defendant. A guideline sentence would best assure that Lopez will be prevented from committing any future crimes.

## VI.    LOPEZ'S SENTENCING RANGE AND SENTENCING DISPARITIES

The Tenth Circuit has observed that "a properly calculated Guidelines sentence will typically reflect an accurate application of the factors listed in § 3553(a)." *United States v. Hildreth*, 485 F.3d 1120, 1128 (10th Cir. 2007). The discussion above demonstrates as much. Lopez has presented no credible or persuasive argument for this Court to doubt that Lopez's guideline imprisonment range appropriately weighs all of the sentencing factors this Court must consider under § 3553(a). For that reason, sentencing Lopez within his guideline imprisonment range would be a fair and appropriate sentence.

Moreover, such a sentence would avoid unwarranted sentencing disparities. The Tenth Circuit has warned against the imposition of "minimal sentences on white-collar criminals" as it raises "concerns of sentencing disparities according to socio-economic status." *Sample*, 901 F.3d at 1201. To any contention that probationary sentences are common for fraud crimes, the data suggests otherwise. *See id.* ("The vast majority of fraud offenders convicted in 2016 were imprisoned."). A guideline sentence is appropriate and the Court should impose one here.

## VII.     RESTITUTION

The Court should impose a restitution order $18,363,213.40 plus prejudgment interest tied to the increase in value of the precious metals purchased.  *See* Doc. 175 at 8.

### CONCLUSION

In his conclusion to his sentencing memorandum, Lopez describes himself as a "broken" and "nearly destitute" man, slowly succumbing to "his many ailments."  Doc. 181 at 16.

To the contrary, however.

He is not broken; he is willful, openly defying this Court's orders.  He is not destitute; he is rich, hiding from this Court $3.5 million dollars.  And he is not succumbing to his ailments; he is a con-man, lunching with his victims.

Lopez has not earned the grace he requests.  When the Court extended that to him at the conclusion of trial, Lopez turned around in less than a week and stole more money from a victim. That is who Lopez is.  A man who will defraud no matter what a Court orders him to do.  For that reason and for all the reasons articulated above, the Court should impose a guideline sentence.

Respectfully submitted,

RYAN ELLISON
United States Attorney

*Electronically filed on May 19, 2025*
FREDERICK MENDENHALL
FRED FEDERICI
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

I hereby certify that on May 19, 2025, I filed
the foregoing electronically through the CM/ECF
System, which caused counsel for the Defendant
to be served by electronic means, as more fully
reflected on the Notice of Electronic Filing.

*/s/*
FREDERICK MENDENHALL
Assistant United States Attorney